MARTIN A. MUCKLEROY, ESQ.
Nevada Bar No. 009634
DUSTIN A. JOHNSON, ESQ.
Nevada bar No. 009306
MUCKLEROY JOHNSON
6767 W. Tropicana Ave., Suite 106
Las Vegas, Nevada 89103
T: 702-248-1065
F: 702-938-4065
Email: martin@muckleroyjohnson.com
          dustin@muckleroyjohnson.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT COURT OF NEVADA

| | |
|---|---|
| SHANA VASEK, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>    v. )<br><br>PARAMETRIC SOUND CORPORATION, KENNETH F. POTASHNER, ELWOOD G. NORRIS, ROBERT M. KAPLAN, SETH PUTTERMAN, ANDREW WOLFE, JAMES L. HONORE, VTB HOLDINGS, INC., and PARIS ACQUISITION CORP., )<br><br>Defendants. ) | Case No.: _____ |

**CLASS ACTION COMPLAINT FOR
BREACH OF FIDUCIARY DUTY AND VIOLATION OF SECTIONS 14(a) AND 20(a)
OF THE SECURITIES EXCHANGE ACT OF 1934 AND SEC RULE 14a-9**

Plaintiff Shana Vasek ("Plaintiff"), on behalf of herself and all others similarly situated, by her attorneys, alleges upon information and belief, except as to those allegations pertaining to Plaintiff which are alleged upon personal knowledge:

**NATURE OF THE ACTION**

1.       This is a stockholder class action brought by Plaintiff on behalf of the holders of

MUCKLEROY JOHNSON

**MUCKLEROY JOHNSON**

the common stock of Parametric Sound Corporation ("Parametric" or the "Company") to enjoin the acquisition of the publicly owned shares of Parametric by VTB Holdings, Inc. ("Turtle Beach") for inadequate consideration through an unfair process.

2.      On August 5, 2013, Parametric and Turtle Beach jointly announced that they had entered into a definitive Agreement and Plan of Merger (the "Merger Agreement") for Turtle Beach to acquire Parametric, via a reverse merger transaction.   Pursuant to the Merger Agreement, Paris Acquisition Corp. ("Merger Sub"), a wholly-owned subsidiary of Parametric, will merge with and into Turtle Beach with Turtle Beach serving as the surviving entity and a wholly-owned subsidiary of Parametric.   Turtle Beach's stockholders will then be issued new shares of Parametric common stock representing approximately 80% of the shares of stock in Parametric (the "Proposed Transaction").   As such, following the closing of the Proposed Transaction, Parametric stockholders will be diluted by receiving only 20% of the stock in the surviving entity.   Moreover, each outstanding option to purchase Turtle Beach common stock will be converted at the effective time (as defined in the Merger Agreement) into an option to purchase Parametric common stock and will be assumed by Parametric.[1]

3.      Following the closing of the Proposed Transaction, Parametric stockholders will be substantially diluted and stand to lose substantial value for their remaining shares in the Company.   At least one observer, believes that following the Proposed Transaction, current Parametric stockholders could lose more than 65-82% of the Company's stock's current value.

4.      Prior to the announcement of the Proposed Transaction, the market recognized Parametric for its technology and innovation, specifically, Parametric's HyperSonic® Sound ("HSS®") technology and accordingly priced Parametric stock at a significant trading premium in relation to its peers.   By contrast, Turtle Beach enjoys no such premium and the Proposed

---

[1]   No fractional shares of Parametric's common stock will be issued pursuant to the Merger Agreement.   Certain redeemable, non-convertible preferred stock of Turtle Beach with a stated value of $12,000,000, plus dividends accrued but unpaid thereon, as well as certain phantom stock units of Turtle Beach, will remain outstanding following the close of the Proposed Transaction and will not be exchanged for Parametric common stock.

Transaction—in its current form—is little more than an attempt by Turtle Beach to inflate the price of its own stock and valuation to the detriment of the Company's stockholders. Recognizing this ploy on the part of Turtle Beach, the market has responded furiously by discounting the Company's own stock and properly aligning it with the valuation projected for the surviving entity.

5. The Proposed Transaction is designed to preclude other potential bidders from emerging with superior offers.  Specifically, the Merger Agreement contains several unfair deal protections that act conjunctively to ensure now superior bid will arise for the Company, including: (i) a "no-shop" or "non-solicitation" provision, (ii) a "matching rights" provision, and (iii) a termination fee of $1 million.

6. Further, on November 4, 2013, Parametric filed the Preliminary Proxy Statement ("Proxy") on Form 14A with the Securities and Exchange Commission (the "SEC") voicing the Board's support for the Proposed Transaction.  The Proxy however misrepresents and fails to disclose material information necessary for the Company's stockholders to make an informed decision as to whether to vote their shares of stock in favor of the Proposed Transaction. Specifically, the Proxy fails to disclose, in violation of the Board's duty of candor under state law and in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 promulgated thereunder, (i) certain management projection metrics relied upon by Craig-Hallum Capital Group LLC ("Craig-Hallum") in performing its selected financial analyses, (ii) certain information regarding the financial analyses performed by Craig-Hallum, the Company's financial advisor on the fairness of the Proposed Transaction, and (iii) several important details regarding the process leading up to the signing of the Merger Agreement.

7. Thus, in pursuing the unlawful plan to facilitate the acquisition of Parametric by Turtle Beach for inadequate consideration, through a flawed sales process, each of the Defendants (defined below) violated applicable law by directly breaching and/or aiding the other Defendants' breaches of their fiduciary duties of loyalty, due care, good faith, and candor.

**MUCKLEROY JOHNSON**

8.    For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, and in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of their fiduciary duties of loyalty, due care, good faith, and candor.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under Sections 14(a) and 20(a) of the Exchange Act.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Parametric is incorporated in this District.

11.    In connection with the acts alleged in this Complaint, Defendants (defined below), directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities market.

## THE PARTIES

12.    Plaintiff is, and at all relevant times was, a stockholder of Parametric since prior to the wrongs complained of herein.

13.    Parametric is a corporation organized and existing under the laws of the State of Nevada, with its principal executive offices located at 1941 Ramrod Avenue, Suite 100, Henderson, Nevada 89014.  Parametric is a technology company with a substantial body of intellectual property focused on delivering directed audio solutions.  Parametric common stock trades on the NASDAQ Stock Market under the ticker symbol "PAMT."

14.    Defendant Kenneth F. Potashner ("Potashner") has been Executive Chairman of the Parametric Board of Directors ("Board" or the "Individual Defendants") since December 2011.

15.    Defendant Elwood G. Norris ("Norris") has been President and a director of the Board since June 2010.  Defendant Norris was the original investor of the HSS technology in the

1990's.  In April 2009, Defendant Norris stepped down as Chairman of the Board ("Chairman") of LRAD Corporation ("LRAD").  Norris was instrumental in convincing the LRAD Board to spin-off the HSS Business into an independent, stand-alone, publically traded company.  In January of 2010, Norris filed for patent protection on new innovations of the Parametric sound technology through Syzygy Licensing LLC ("Syzygy").  Defendant Norris is Syzygy's majority owner, Chief Financial Officer, and Treasurer.  Moreover, Defendant Norris owns 1,086,270 shares or 16.8% of all outstanding Parametric shares.

16.    Defendant Robert M. Kaplan ("Kaplan") has been a director of Parametric since May 2010.

17.    Defendant Seth Putterman ("Putterman") has been a director of Parametric since May 2010.

18.    Defendant Andrew Wolfe ("Wolfe") has been a director of Parametric since February 2012.

19.    Defendant James L. Honore ("Honore") has been a director of Parametric since March 2012.

20.    Each of the Individual Defendants herein is sued individually, and as an aider and abettor, as well as in his capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

21.    Defendant Turtle Beach is a corporation organized and existing under the laws of Delaware, with its principal executive offices located at 100 Summit Lake Drive, Suite 100, Valhalla, NY 10594.

22.    Defendant Merger Sub is a Delaware corporation and wholly-owned subsidiary of Parametric formed solely for the purpose of entering into the Merger Agreement and effectuating the Proposed Transaction, and has conducted no business operations other than those incident to its formation.

23.    Collectively, the Individual Defendants, Parametric, Turtle Beach, and Merger

MUCKLEROY JOHNSON

1   Sub are referred to herein as the "Defendants."

2   **THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

3   24.    By reason of the Individual Defendants' positions with the Company as officers

4   and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other

5   stockholders of Parametric and owe Plaintiff and the other members of the Class (defined herein)

6   the duties of loyalty, due care, good faith, and candor.

7   25.    By virtue of their positions as directors and/or officers of Parametric, the

8   Individual Defendants, at all relevant times, had the power to control and influence, and did

9   control and influence and cause Parametric to engage in the practices complained of herein.

10   26.    Each of the Individual Defendants is required to act in good faith, in the best

11   interests of the Company's stockholders and with such care, including reasonable inquiry, as

12   would be expected of an ordinarily prudent person.  To diligently comply with this duty, the

13   directors of a corporation may not take any action that:

14   a.    Adversely affects the value provided to the corporation's stockholders;

15   b.    Contractually prohibits them from complying with or carrying out their

16   fiduciary duties;

17   c.    Discourages or inhibits alternative offers to purchase control of the

18   corporation or its assets;

19   d.    Will otherwise adversely affect their duty to search for and secure the best

20   value reasonably available under the circumstances for the corporation's stockholders; or

21   e.    Will provide the directors and/or officers with preferential treatment at the

22   expense of, or separate from, the public stockholders.

23   27.    In accordance with their duties of loyalty and good faith, the Individual

24   Defendants are obligated to refrain from:

25   a.    Participating in any transaction where the Individual Defendants' loyalties

26   are divided;

27   b.    Participating in any transaction where the Individual Defendants receive,

28

6

MUCKLEROY JOHNSON

or are entitled to receive, a personal financial benefit not equally share by the public stockholders of the corporation; and

      c.    Unjustly enriching themselves at the expense or to the detriment of the public stockholders.

28.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith, and due care owed to the Company, or are aiding and abetting others in violating those duties.

29.    The Individual Defendants also owe the Company's stockholders a duty of candor, which includes the disclosure of all material facts concerning the Proposed Transaction and, particularly, the fairness of the price offered for the stockholders' equity interest. The Individual Defendants are knowingly or recklessly breaching their fiduciary duties of candor by failing to disclose all material information concerning the Proposed Transaction and/or aiding and abetting other Defendants' breaches.

### CLASS ACTION ALLEGATIONS

30.    Plaintiff brings this action pursuant to the Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and/or entities that own Parametric common stock (the "Class"). Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

      a.    The Class is so numerous that joinder of all members is impracticable. As of August 7, 2013, there were 6,818,321 shares of Parametric common stock issued and outstanding. Members of the Class are scattered throughout the United States and are so numerous that it is impracticable to bring them all before this Court.

      b.    Questions of law and fact are common to the Class, including, *inter alia*, the following:

          i.    Whether the Individual Defendants breached their fiduciary duties

of undivided loyalty, care, and good faith with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

ii.    Whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

iii.    Whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

iv.    Whether Parametric, Turtle Beach, and/or Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty;

v.    Whether the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and the other members of the Class;

vi.    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated; and

vii.    Whether the Class is entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

c.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

d.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

e.    Plaintiff will fairly and adequately protect the interests of the Class, and

8

1   has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

2       f.      A class action is superior to all other available methods for the fair and

3   efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in

4   the management of this action that would preclude its maintenance as a class action.

5                           **SUBSTANTIVE ALLEGATIONS**

6   **A.      Background**

7       31.    Parametric was incorporated under the laws of the State of Nevada on June 2,

8   2010, as a new and wholly-owned subsidiary of LRAD Corporation in an effort to effectuate the

9   separation and spin-off of the HSS® business as a stand-alone, independent, and publically-

10  traded company.   Now, the Company has embarked on selling and marketing its new HSS-

11  3000® technology produced by utilizing the Company's HSS-III® technology.

12      32.    Parametric is a technology company with a substantial body of intellectual

13  property (23 U.S. patents, 2 foreign patents and 13 patents pending) focused on delivering

14  directed audio solutions.  The Company's HSS® technology pioneered the practical application

15  of parametric acoustic technology for generating sound along a directional ultrasonic column.

16  Parametric's HSS-3000 product line delivers directed audio solutions to customers primarily for

17  digital signage, point-of-purchase, in-store network, and related applications that benefit from

18  focused sound targeted to specific locations.

19      33.    Since the Company's founding, Parametric has provided directed audio solutions

20  improving the utility of sound to effectively communicate.  A main advantage of directed audio

21  is the ability to focus communications to target audiences without the disrupting clutter of

22  unwanted ambient noise.  HSS® technology uses nonlinear acoustics, which uses changing

23  pressures in air to produce sound indirectly by carrying content into the air along ultrasonic

24  frequencies.  Parametric sound technology has gone through various iterations of both speaker

25  (called emitters in parametric sound applications) designs and amplifier and processing

26  electronics since active development began in 1995.  Between 2004 to 2010, LRAD sold over

27  11,000 HSS® systems.

28

**MUCKLEROY JOHNSON**

**MUCKLEROY JOHNSON**

34.     Following the spin-off, Parametric has been able to focus additional resources on developing, testing, tooling, and producing a new line of HSS® products through its HSS-3000 product series.   These products build upon prior HSS® technology with the licensed new technology, feature new customer utility as a result of new designs and demonstrate improved performance at a reduced manufacturing cost. This is considered to be the third generation of the HSS® technology and the current technology platform is referred to as HSS-III technology. After initial customer evaluations and testing, in July 2011 Parametric commenced sales of new HSS-3000 products based on the HSS-III technology.

35.     In September of 2010, the Company entered into exclusive worldwide license agreements with Syzygy, an entity controlled by Norris.  As described above, Norris previously assigned to Syzygy patent technology and trade secrets relating to new and improved methods of processing media input to create parametric sound output for parametric emitter devices such as those employed by the Company.  These licenses entered into between the Company and Syzygy require the Company to pay 5% of revenues from products employing the technology for a term of 20 years or the life of the patent, whichever is greater to Defendant Norris.

36.     Finally, the Company has recently announced that it plans on developing new technology to accompany the emerging 3D video market space for computers, homes and theaters.  If the Company is successful in producing innovative directed acoustic solutions for 3D video, Parametric stockholders stand to benefit substantially from this innovation.   Also, Parametric has commenced Food & Drug Administration ("FDA") approval for virtual hearing aid products employing HSS® technology.  While hearing aid products are in the early stage of development and testing, if the Company received FDA approval for these products that Company and its stockholders stand to substantially benefit from the sales of these products and the increased revenue that such products would generate for the Company.

**B.     The Proposed Transaction**

37.     On August 5, 2013, Parametric and Turtle Beach jointly announced the Proposed Transaction.  The press release stated, in part:

SAN DIEGO, CA--(Marketwired - Aug 5, 2013) -  Parametric Sound Corporation (NASDAQ: PAMT), a leading innovator of audio products and solutions, and Turtle Beach, the market leader in video game audio, today announced that the companies have reached a Definitive Agreement to merge in a stock for stock transaction. The merger will combine Parametric's audio innovations with Turtle Beach's significant financial, technical, design, sales and marketing resources. Parametric's strong research and development capabilities will be leveraged to accelerate innovation enabling the combined company to deliver sustained growth and shareholder value.

Turtle Beach is an audio technology innovator and has created the market for advanced gaming headsets. Their advanced products allow video game players to experience high-quality, immersive sound and communicate with others while playing video games. The company has gained a dominant position in gaming headsets through a combination of audio technology innovation, quality, marketing savvy and effective retail distribution. Turtle Beach has strong market share in established gaming markets, including a 53% dollar share of the U.S. gaming headset market as of year-end 2012 according to The NPD Group, and a growing market share in the broader consumer audio market. As a result, the company has built a profitable business with approximately $205 million in revenues in 2012. Turtle Beach is majority owned by the Stripes Group, an entrepreneurial growth equity fund based in New York City.

The combined company will be able to leverage Turtle Beach's global distribution network and experience to bring new products to market. Turtle Beach headsets are sold at more than 27,000 storefronts across 40 countries, including major retailers such as Best Buy, Carrefour, GameStop, HMV, Sainsbury, Target, Tesco and Wal-Mart.

Under the terms of the agreement, former Turtle Beach stockholders are expected to own approximately 80 percent of the combined company´s shares outstanding at closing, and Parametric stockholders are expected to own approximately 20 percent of the combined company's shares, subject to adjustment as provided in the merger agreement. The new company will continue to operate under the name Parametric Sound Corporation and will be headquartered in San Diego. The gaming products will continue under the well regarded Turtle Beach brand. In connection with the proposed transaction, Parametric intends to file with the SEC a proxy statement and other relevant materials and documents regarding the proposed transaction.

"This merger positions us to fully realize the potential of our advanced technology and accelerate the worldwide adoption of HyperSound™ in our core consumer, commercial and health care markets. Turtle Beach has a history of leveraging proprietary audio technology to gain market leadership with strong operating margins," said Ken Potashner, Executive Chairman of Parametric Sound. "Turtle Beach has the resources and experience to help us develop and market disruptive products and they offer access to an extensive distribution network to make current and planned products available across the globe. We believe the merger will prove to be compelling for both our customers and our stockholders, and we expect a smooth integration process in combining our two companies."

Juergen Stark, CEO of Turtle Beach, will serve as CEO upon completion of the merger. Mr. Stark joined Turtle Beach as CEO in September 2012. Prior to joining Turtle Beach, Stark served as chief operating officer for Motorola

Mobility Holdings, Inc.'s Mobile Devices business through the sale of that business to Google in 2012. Ken Potashner, Executive Chairman of Parametric, and Ron Doornink, Executive Chairman of Turtle Beach and former President of Activision, will serve on the company's Board of Directors.

"Parametric's breakthrough technology, which is supported by a significant intellectual property portfolio, provides an immersive experience in a way that existing speakers simply cannot match. The commercial potential is astounding, and we cannot wait to bring new applications to market," said Juergen Stark, CEO of Turtle Beach. "Parametric also brings additional expertise in audio and digital signal processing that will accelerate innovation in our gaming audio products."

The companies share a legacy of innovation in audio technology and digital signal processing. Parametric has developed and patented disruptive audio technology including HyperSound™ (HSS®) directional audio technology. HSS® delivers high fidelity audio in a directional beam using thin sound emitters -- a radical innovation in speaker technology. Currently used in commercial applications including retail digital signage, the innovative technology is expected to have transformative applications in video game audio, personal computers, mobile devices, televisions and home theater. The Company's patented technology continues to demonstrate positive results for those with hearing deficiencies and show strong potential for future health care applications.

The merger transaction, approved by the Board of Directors of both companies, is expected to close before the end of the 2013 calendar year, subject to approval by Parametric's stockholders and certain other closing conditions more fully described in the definitive agreement.

**C.** **The Unfair Share Price**

38.     Prior to the announcement of the Proposed Transaction, the market recognized Parametric for its technology and innovation, specifically, Parametric's HSS® technology and accordingly priced Parametric stock at a significant trading premium in relation to its peers.  By contrast, Turtle Beach enjoys no such premium and the Proposed Transaction—in its current form—is little more than an attempt by Turtle Beach to inflate the price of its own stock and valuation to the detriment of the Company's stockholders.  Recognizing this ploy on the part of Turtle Beach, the market has responded furiously since the announcement of the Proposed Transaction by discounting the Company's own stock and properly aligning it with the valuation projected for the surviving entity.  As recently as October 8, 2013, the Company's stock price dropped below $11.11 per share.

39.     The consideration offered to Parametric's public stockholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the Company's

intrinsic value and future earnings far exceed the consideration being offered through the reverse merger.  Importantly, the consideration offered to Parametric stockholders provides them no premium for the valuable patent technology the Company controls and the HSS-3000 and HSS-III Technology that is far superior to the Company's competitors technology.

40.    Paul Santos ("Santos"), from the website *Seeking Alpha* summarized the result of the Proposed Transaction for Parametric stockholders in an article entitled "Parametric Sound Merger Not Likely to Be Positive For Shareholders."  According to Santos, the merger stands to be potentially disastrous to stockholders, the article states, in relevant part, that:

> Once the merger goes through, however, the resulting company is likely to be valued according to its present fundamentals and prospects.
>
> * * *
>
> Comparable companies such as Skullcandy (SKUL) or Logitech (LOGI), while profitable, trade at deeply discounted valuations. Since all we know about Turtle Beach are its revenues, the one metric that concerns us is price/sales. Skullcandy trades at a price/sales of 0.56, and Logitech trades at a price/sales of 0.53.
>
> The main way that Turtle Beach would earn a higher valuation multiple, would be for it to be much more profitable than either Skullcandy or Logitech. But that's not likely - Turtle Beach is even accruing dividends on its preferred, and that's not the move of a hugely profitable enterprise.
>
> So we can reasonably expect Turtle Beach to trade at a valuation that's close to its comparables. Something between 0.50 times sales and, to be generous, 1.00 times sale.
>
> That would mean that the new Parametric Sound would trade with a market capitalization of somewhere between $102.5 million and $205 million. But remember, present PAMT shareholders will have just 20% of this new company. This would give them a value of between $20.5 and $41 million. *And therein lies the problem - PAMT presently trades with a market capitalization of $118.1 million, so if Turtle Beach happens to converge to the valuation of its comparables, then the downside for present PAMT shareholders will be somewhere between 65% and 82%.*
>
> *In short, this merger has the potential to be disastrous for PAMT shareholders.*
>
> *The only hope would be for the shares to trade at a huge premium, which would be a bonanza for Turtle Beach shareholders - the shares would have to trade at a market capitalization of $590.5 million for PAMT shareholders not to lose, and this would value Turtle Beach shares at $472.4 million for a price/sales on the deal of 2.3 times (for Turtle Beach shareholders only). This is unlikely to happen given what we saw regarding comparable companies.*

So the one thing that's likely to happen is for PAMT shareholders to lose and lose big. (emphasis added)

**D.     The Unfair Deal Protections**

41.     On August 5, 2013, the Company filed a Form 8-K with the SEC wherein it disclosed the terms of the Merger Agreement.  To the detriment of Parametric stockholders, as part of the Merger Agreement, the Individual Defendants agreed to unreasonable deal protection devices that operate conjunctively to lock-up the Proposed Transaction and ensure that no competing offers will emerge for the Company.

42.     First, the Merger Agreement contains a strict "no solicitation" provision prohibiting the Board from taking any affirmative action to comply with their fiduciary duties to obtain the best price under the circumstances for the Company's stockholders.  Specifically, the "no solicitation" provision prohibits the Board and any Company personnel from soliciting, initiating, facilitating, or encouraging alternative proposals in an attempt to procure a price in excess of the amount offered by Turtle Beach.  This section also demands that the Company terminate any and all prior or on-going discussions with other potential suitors.

43.     Second, § 5.5 of the Merger Agreement provides a "matching rights" provision pursuant to which the Company must notify Turtle Beach of any unsolicited competing bidder's offer within twenty-four (24) hours after receipt.  Then, if and only if, the Board determines that the competing offer constitutes a "Superior Proposal," (as defined in the Merger Agreement) Turtle Beach is granted at least five (5) business days (the "Notice Period") to amend the terms of the Merger Agreement to make a counter-offer that the Company must consider in determining whether the competing bid still constitutes a "Superior Proposal."  Moreover, Turtle Beach will be able to match the unsolicited offer because it will be granted unfettered access to the details of the unsolicited offer, eliminating any leverage that the Company has in receiving the unsolicited offer.

44.     The effect of these provisions is to prevent the Board from entering discussions or negotiations with other potential purchasers unless the Board can first determine that the

competing acquisition proposal is, in fact, "superior," and even then, the Company must give Turtle Beach five (5) business days to match the competing acquisition proposal. Consequently, this provision prevents the Board from exercising their fiduciary duties and precludes an opportunity for a potential purchaser to emerge.

45.     Additionally, the Merger Agreement provides that Parametric must pay to Turtle Beach a termination fee of $1 million if the Company decides to pursue another offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the Company's stockholders with a superior offer.  A termination fee in the amount of $1 million discourages any other bidder from coming forward with a superior offer.

46.     Ultimately, these deal protection devices restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The aggregate effect of these deal protection devices, viewed in light of the materially inadequate consideration offered for Parametric shares in the Proposed Transaction, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

47.     Moreover, upon information and belief, certain directors and officers of the Company have entered into voting agreements agreeing to vote in favor of the Proposed Transaction.  Based upon the Company's Proxy filed with the SEC, the Company's directors, officers, and Turtle Beach, controlling 37.75%[2] of the Company outstanding shares of stock in the Company have signed voting agreements to vote for the Proposed Transaction and against any alternative proposal.  Thus, 37.75% of Parametric's common stock is already "locked up" in favor of the Proposed Transaction.

### E.     The Materially Misleading Proxy Statement

48.     On November 4, 2013, Parametric filed the Proxy with the SEC.  The Proxy

---

[2]     The 37.75% of common stock outstanding and locked up through voting agreements, includes: VTB Holdings Inc. (19.26%), Elwood G. Norris (14.83%), James A. Barnes (3.18%), Robert M. Kaplan (0.42%), and Seth Putterman (0.06%).

MUCKLEROY JOHNSON

failed to provide the Company's stockholders with material information in contravention to the Board's duty of candor and in violation of Sections 14(a) and 20(a) of the Exchange Act.

49. Without such information, Parametric's stockholders will be unable to make a fully informed decision as to whether to vote their shares of stock for or against the Proposed Transaction.

### 1. Materially Incomplete and Misleading Statements/ Omissions Regarding Management's Financial Projections

50. The Proxy discloses that Craig-Hallum relied on certain management projections from the Company and Turtle Beach to render its fairness opinions. However, the Proxy, on page 74, fails to disclose unlevered free cash flows for Parametric and/or Turtle Beach. While the Proxy, at page 74, provides certain projections, the Proxy fails to provide all necessary inputs (*i.e.*, Depreciation and Amortization and EBITDA). Thus, it is material for Defendants to disclose the unlevered free cash flows or provide the inputs necessary to calculate unlevered free cash flows.

### 2. Materially Incomplete and Misleading Disclosures Concerning Craig-Hallum's Financial Analysis

51. The Proxy also disclosed certain information regarding Craig-Hallum's financial analyses used to support its fairness opinion. These disclosures concerning Craig Hallum's financial analyses are materially incomplete and misleading in several ways.

52. First, in the *Parametric Historical Trading Analysis*, the Proxy must disclose the high and low range for Parametric's stock for the one year period ending August 2, 2013. This omission is material because without this information, Parametric stockholders will be unable to fully understand Craig-Hallum's analysis, and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining to vote for or against the Proposed Transaction.

53. Second, in the *Comparable Public Company Analysis-Parametric Stand-Alone*, the Proxy must disclose: (i) the criteria relied upon by Craig-Hallum in selecting the comparable companies; (ii) the multiples and metrics observed by Craig-Hallum for each of the comparable

MUCKLEROY JOHNSON

companies, especially in light of the wide variance in the range of the selected multiples; (iii) whether other multiples were considered (*i.e.*, TEV/2014E Revenue, TEV/2014E Adjusted EBITDA, and MC/ 2014E Net Income), and if such multiples were considered, the Proxy must disclose them; (iv) whether historical multiples were considered, and if not the rationale for Craig-Hallum considering only future multiples in the analysis; and (v) define total enterprise value ("TEV") and market capitalization ("MC"). These omissions are material because without this information, Parametric stockholders are unable to fully understand Craig-Hallum's analysis, and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining whether to vote for or against the Proposed Transaction.

54. Third, in the *Precedent Transactions Analysis-Parametric Stand-Alone*, the Proxy must disclose: (i) the multiples observed; (ii) whether other pricing multiples were considered (besides TV to LTM and TV to EBITDA) and if such multiples were considered, the Proxy must disclose them; (iii) the transaction values for each transaction selected and whether transactions were considered but ultimately excluded; and (iv) quantify the net debt assumed to calculate the implied equity values. These omissions are material because without this information, Parametric stockholders are unable to fully understand Craig-Hallum's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

55. Fourth, in the *Discounted Cash Flow Analysis—Parametric Stand-Alone*, the Proxy must disclose: (i) the definitions of implied and terminal values used in the analysis; (ii) the basis or source for selecting a tax rate of 37.5%; (iii) whether such multiples were derived from the *Comparable Public Company Analysis-Parametric Stand-Alone* or *Precedent Transactions Analysis-Parametric Stand-Alone*; (iv) the market assumptions relied upon to calculate the weighted average cost of capital ("WACC"); (v) the definition of WACC; (vi) quantify net debt relied upon in this analysis; and (vii) whether stock based compensation was utilized as a cash or non-cash expense. These omissions are material because without this information, Parametric stockholders are unable to fully understand Craig-Hallum's analysis and,

thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

56.     Fifth, in the *Comparable Public Company Analysis-Turtle Beach Stand-Alone*, the Proxy must disclose: (i) the criteria relied upon by Craig-Hallum is selecting the comparable companies; (ii) the line-by-line multiples and metrics observed by Craig-Hallum for each of the comparable companies, especially in light of the variance in the range of multiples selected; and (iii) whether other multiples were considered and if other multiples were considered, then the Proxy must disclose them.  These omissions are material because without this information, Parametric stockholders are unable to fully understand Craig-Hallum's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

57.     Sixth, in the *Precedent Transactions Analysis-Turtle Beach Stand-Alone*, the Proxy must disclose: (i) the transaction-by-transaction multiples; (ii) whether other pricing multiples were considered (besides TV/ Adjusted EBITDA and TV/ EBIT) and if other multiples were considered, then the Proxy must disclose them; (iii) the transaction values for each transaction selected and whether certain transactions were considered, but ultimately excluded; and (iv) quantify the net debt applied by Craig-Hallum in this analysis.  These omissions are material because without this information, Parametric stockholders are unable to fully understand Craig-Hallum's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining whether to vote for or against the Proposed Transaction.

58.     Seventh, in the *Discounted Cash Flow Analysis-Turtle Beach Stand-Alone*, the Proxy must disclose: (i) the definitions for terminal value and implied value used by Craig-Hallum in this analysis; (ii) the basis and source for applying a tax rate of 37.5%; (iii) whether the LTM adjusted EBIT multiples were derived from the *Comparable Public Company Analysis-Parametric Stand-Alone* or *Precedent Transactions Analysis-Parametric Stand-Alone*; (iv) the market assumptions utilized by Craig-Hallum for calculating the weighted average cost of capital ("WACC"); (v) the definition of WACC; (vi) quantify the net debt utilized by Craig-Hallum in

MUCKLEROY JOHNSON

this analysis; and (vii) whether stock based compensation was applied as a cash or non-cash expense.   These omissions are material because without this information, Parametric stockholders are unable to fully understand Craig-Hallum's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining whether to vote for or against the Proposed Transaction.

### 3.   Material Incomplete and Misleading Disclosures Regarding Craig-Hallum's Compensation

59.   On page 72, the Proxy fails to disclose whether Craig-Hallum has performed work for the Company and/or Turtle Beach in the past-two years and/or received fees for those services.   This information is material to the Company's stockholders to determine whether Craig-Hallum had any conflict of interest when it issued the fairness opinion on the Proposed Transaction.

### 4.   Materially Income and Misleading Disclosures Regarding the Flawed Process

60.   The Proxy also omits several important details regarding the process leading up to the signing and announcement of the Merger Agreement.

61.   The Proxy, on page 47, provides that "[o]n March 7, 2013, Parametric entered into a Mutual Non-Disclosure Agreement with Voyetra Turtle Beach, Inc."  However the Proxy fails to disclose how Turtle Beach learned that the Company was exploring strategic alternatives, who from Parametric was contacted by Turtle Beach, and whether price and/or terms were discussed between Parametric and Turtle Beach before signing the non-disclosure agreement. This information is material to stockholders' consideration of the integrity of the sales process as a whole and whether the Individual Defendants obtained the best price possible under the circumstances.

62.   The Proxy, on page 47, provides that "[f]rom March 13, 2013 to March 25, 2013, representatives of Houlihan Lokey held three telephonic meetings with Parametric officers to discuss potential transaction alternatives with Turtle Beach…"  However, the Proxy fails to

disclose when Houlihan Lokey was first retained by the Board, or disclose the "potential transaction alternatives" that Houlihan Lokey discussed with Parametric officers, and who from parametric was present at this meeting.   This information is material to stockholders' consideration of the integrity of the sales process as a whole and whether the Individual Defendants obtained the best price possible under the circumstances.

63.   The Proxy, on page 47, provides that "[o]n March 20, 2013, Parametric's executives provided a demonstration of the Company's technology" to business development personnel and technology representatives of Company A and Company B.  The Proxy, however, fails to disclose how Company A and Company B became aware of the fact that Parametric was exploring a sale of the Company, whether Company A, before meeting with Parametric's executives, submitted a non-binding indication of interest, whether Company A entered into and signed a non-disclosure agreement with the Company, and whether the board, its officers, or Houlihan Lokey ever discussed terms between Company A and/or Company B to acquire the Company.  This information is material to stockholders' consideration of the integrity of the sales process as a whole and whether the Individual Defendants obtained the best price possible under the circumstances.

64.   The Proxy, on page 47, provides that "[on] March 27, 2013, representatives of Houlihan Lokey met in-person with Parametric officers to review potential strategic buyers of Parametric and to finalize engagement terms."  The Proxy, however, fails to disclose how many potential strategic buyers were considered by Houlihan Lokey, why no financial buyers were considered by Houlihan Lokey in its initial analysis to Parametric officers, and whether Parametric officers participated in identifying the "potential strategic buyers."  This information is material to stockholders' consideration of the integrity of the sales process as a whole and whether the Individual Defendants obtained the best price possible under the circumstances.

65.   The Proxy, on page 47, provides that "[o]n March 28, 2013, Parametric issued a press release announcing that it had been approached by several industry leaders in key target verticals to discuss strategic alternatives…"  The Proxy, however, fails to disclose how many

"industry leaders" approached the Company to discuss strategic alternatives, whether these "industry leaders" included Company A or Company B and/or others, and whether price and/or terms were discussed between Parametric and these "industry leaders."   This information is material to stockholders' consideration of the integrity of the sales process as a whole and whether the Individual Defendants obtained the best price possible under the circumstances.

66.     The Proxy, on page 48, provides that "[f]rom April 1, 2013 to April 22, 2013, representatives of Houlihan Lokey contacted and held varying levels of discussions with a total of 13 parties other than Turtle Beach regarding a transaction involving Parametric."   The Proxy, however, fails to disclose the composition (*i.e.*, strategic or financial buyers) of the "total 13 parties" contacted by Houlihan Lokey, and if no financial buyers were solicited, the rationale for not including financial buyers in Houlihan Lokey's initial outreach.   This information is material to stockholders' consideration of the integrity of the sales process as a whole and whether the Individual Defendants obtained the best price possible under the circumstances.

67.     The Proxy, on page 48, provides that "[a]lthough Company A declined to pursue an acquisition of Parametric, the parties continue to discuss licensing and co-development business."   The Proxy fails to disclose the rationale for why Company A was not interested in pursuing an acquisition of Parametric, but wanted to continue licensing and co-development opportunities.   This information is material to stockholders' consideration of the integrity of the sales process as a whole, whether all potential alternative strategic alternatives were explored by the Board, and whether the Individual Defendants obtained the best price possible under the circumstances.

68.     The Proxy, on page 48, provides that "[o]n April 12, 2013, Company C requested an introductory call with Parametric. On that same day, the parties entered into a confidentiality agreement dated April 12, 2013."   The Proxy fails to disclose whether Party C was part of the initial 13 parties solicited by Houlihan Lokey, whether Party C indicated whether it was interested in exploring a strategic alternative transaction or licensing agreement with the Company, and whether Party C expressed price and/or terms during the initial outreach.   This

information is material to stockholders' consideration of the integrity of the sales process as a whole, whether all potential alternative strategic alternatives were explored by the Board, and whether the Individual Defendants obtained the best price possible under the circumstances.

69.     The Proxy, on page 48, provides that "[o]n April 20, 2013, a telephonic meeting of the Parametric Board was held with its financial and legal advisors. At the meeting . . . [r]epresentatives of Houlihan Lokey presented information regarding Turtle Beach and the rationale for the transaction. Houlihan Lokey also advised the Parametric Board that the Parametric Board should consider retaining a second investment bank to provide a fairness opinion in a potential transaction between Parametric and Turtle Beach in order to avoid the appearance of a conflict of interest resulting from Houlihan Lokey's previous engagement by Turtle Beach on an unrelated matter in early 2012." The Proxy, however, fails to disclose the work Houlihan Lokey performed for Turtle Beach and the fees received by Houlihan Lokey for such services. The Proxy also fails to disclose when the Board was first apprised of Houlihan Lokey's potential conflict w/ Turtle Beach, the rationale for not considering other potential financial advisors, and why the Board did not ultimately select a non-conflicted financial advisor to pursue and oversee the Company's sales process. The Company's stockholders are entitled to know what conflicts Houlihan Lokey has in connection with the Proposed Transaction and the events that ultimately led to Craig-Hallum being retained and issuing the fairness opinion on the Proposed Transaction.

70.     The Proxy, at page 49, similarly provides that at the April 19th meeting of the Board, "[t]he Parametric Board discussed the proposed exclusivity agreement with Turtle Beach and the likelihood of alternative strategic transactions, and approved Parametric entering into the exclusivity agreement." The Proxy fails to disclose what the Board considered regarding the likelihood of "alternative strategic transactions" and the prospects of remaining a stand-alone entity, including entering into a licensing agreement with other potential bidders prior to entering into the exclusivity agreement with Turtle Beach. This information is material to stockholders' consideration of the integrity of the sales process as a whole, whether all potential strategic

alternatives were explored by the Board, and whether the Individual Defendants obtained the best price possible under the circumstances.

71. The Proxy, at page 49, provides that "[o]n May 1, 2013 . . . representatives of Parametric provided information in response to a request from Company C. On that same day, Parametric made an additional product demonstration to technical personnel at an engineering location of Company C." The Proxy fails to disclose whether Company C provided Parametric with a non-binding indication of interest or discussed terms and/or price before meeting with representatives of Parametric on May 1, 2013. This information is material to stockholders' consideration of the integrity of the sales process as a whole and whether the Individual Defendants obtained the best price possible under the circumstances.

72. The Proxy, at page 52, provides that "[o]n June 13, 2013, Parametric and Turtle Beach signed a new exclusivity agreement. On that same day, Parametric issued a press release announcing that Turtle Beach (referred to in the press release anonymously as the "strategic partner") had completed its technology due diligence of Parametric's patents and IP, technology, products, markets and consumer preferences, and reported positive results. The press release also announced that (i) Parametric and the "strategic partner" had moved to an exclusive negotiating period and were working on the merger agreement . . ." The Proxy, however, fails to disclose whether Company C was provided with the opportunity to top the terms of Turtle Beach's most recent bid prior to entering into the second exclusivity agreement with Turtle Beach. This information is material to stockholders' consideration of the integrity of the sales process as a whole and whether the Individual Defendants obtained the best price possible under the circumstances.

73. The Proxy, at page 55, provides that on July 23, 2013, the "Parametric Board discussed, but took no action with respect to, potential cash bonuses under Parametric's 2013 Cash Bonus Plan, including the payment in full of such bonuses to Messrs. Potashner, Barnes and Norris upon the closing of the proposed merger with Turtle Beach, as well as potential "double trigger" acceleration of vesting of stock options upon such merger for Parametric's

23

executive officers and directors." The Proxy fails to disclose why the Board allowed Potashner to negotiate on behalf of the Company in light of the conflicts of interest inherent from the acceleration of certain stock options and the potential for a 'double trigger' of certain stock options. This information is particularly important because it could evidence possible conflicts of interest among the Individual Defendants regarding special benefits that would inure to them if the Proposed Transaction is consummated.

74. The Proxy, at page 58, provides that "[f]rom August 5, 2013 to September 4, 2013, pursuant to the 30-day 'go shop' period provided for in the merger agreement, representatives of Houlihan Lokey contacted 49 prospective buyers (many of which had been previously contacted earlier in the process, including Company A, Company B and Company C), in a variety of industries, to solicit acquisition proposals for Parametric." The Proxy fails to disclose the rationale for Houlihan Lokey soliciting 45 parties during the go-shop period, but only solicited 13 parties during the initial sales process. Moreover, the Proxy fails to disclose the composition of the 45 parties solicited (*i.e.*, whether such parties were financial buyers or strategic buyers) and if no financial buyers were solicited, then the rationale for not soliciting such parties during the go-shop period. This information is material to stockholders' consideration of the integrity of the sales process as a whole and whether the Individual Defendants obtained the best price possible under the circumstances.

75. The Proxy, at page 39, discloses that Norris serves as a manager of EGN VTBH LLC ("EGN"). The Proxy must disclose whether EGN is an affiliated entity of Turtle Beach, and if EGN is an affiliated entity of Turtle Beach, the Proxy must disclose Norris' role in managing EGN and the period of time for which Norris has acted as manager. This information is material to stockholders' consideration of the integrity of the sales process as a whole and whether Norris is conflicted and/or improperly interested in the Proposed Transaction.

76. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

**CLAIMS FOR RELIEF**

**COUNT I**

**Claim for Breach of Fiduciary Duties Against the Individual Defendants**

77.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

78.     The Individual Defendants have violated fiduciary duties of care, loyalty, good faith, and candor owed to public stockholders of Parametric.

79.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Parametric.

80.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, care, good faith, and candor owed to the stockholders of Parametric because, among other reasons, they failed to take reasonable steps to obtain the best price possible under the circumstances.   Moreover, the Individual Defendants breached their duty of candor by failing to fully disclose to Plaintiff and the Class all material information necessary to make an informed decision regarding whether to vote in favor of the Proposed Transaction.

81.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

82.     As a result of the actions of Defendants, Plaintiff, and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Parametric's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

83.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable

MUCKLEROY JOHNSON

harm of the members of the Class.

84.     Plaintiff and the members of the Class have no adequate remedy at law.

### COUNT II

**On Behalf of Plaintiff and the Class Against Parametric, Turtle Beach, and Merger Sub for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty**

85.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

86.     Parametric, Turtle Beach, and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Parametric's public stockholders, and has participated in such breaches of fiduciary duties.

87.     Parametric, Turtle Beach, and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, Parametric, Turtle Beach, and Merger Sub rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

88.     Plaintiff and the members of the Class have no adequate remedy at law.

### COUNT III

**On Behalf of Plaintiff and the Class Against Parametric, Turtle Beach, Merger Sub, and the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

89.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

90.     Plaintiff brings this Exchange Act claim on behalf of herself as an individual only.

91.     Parametric, Turtle Beach, and Merger Sub, and the Individual Defendants have caused the Proxy to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

92.     Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

26

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

93.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

94.     By virtue of the foregoing, Parametric, Turtle Beach, Merger Sub and the Individual Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. The Proxy violates Section 14(a) and SEC Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Parametric, Turtle Beach, Merger Sub, and the Individual Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render then non-misleading.

95.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the stockholder vote on the Proposed Transaction.

## COUNT IV

**On Behalf of Plaintiff and the Class Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

96.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.     Plaintiff brings this Exchange Act claim on behalf of herself as an individual only.

98.     The Individual Defendants acted as controlling persons of Parametric within the

MUCKLEROY JOHNSON

meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Parametric, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

99.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

101.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

102.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

103.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

MUCKLEROY JOHNSON

104.    As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in her favor and in favor of the Class and against Defendants as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying Plaintiff as Class representative;

B.    Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing fair terms to stockholders and requiring Defendants to fully disclose to Plaintiff and the Class all material information necessary to make an informed decision regarding whether to vote in favor of the Proposed Transaction;

C.    Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.    Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.    Granting such other and further equitable relief as this Court may deem just and proper.

MUCKLEROY JOHNSON

Dated: November 12, 2013

Respectfully submitted,

**MUCKLEROY JOHNSON**

By: _____*/s/  Martin A. Muckleroy*_____
               Martin A. Muckleroy, Esq.
Nevada Bar No. 9634
Dustin A. Johnson, Esq.
Nevada Bar No. 9306
6767 W. Tropicana Ave., Suite 106
Las Vegas, Nevada 89103
Tel: (702)- 248-1065
Fax: (702)-938-4065

*Attorneys for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Juan E. Monteverde
David M. Sborz
369 Lexington Ave., Tenth Floor
New York, NY  10017
Tel: (212) 983-9330
Fax:  (212) 983-9331

*Attorneys for Plaintiff*